UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


OVERLAND SOLUTIONS, INC.

VERSUS

DAVID CHRISTENSEN, ET AL

CIVIL ACTION

NUMBER 06-53-JVP-SCR

**<u>NOTICE</u>**

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the U. S. District Court.

In accordance with 28 U.S.C. §636(b)(1), you have ten days after being served with the attached report to file written objections to the proposed findings of fact, conclusions of law, and recommendations set forth therein. Failure to file written objections to the proposed findings, conclusions and recommendations within ten days after being served will bar you, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.

ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.

Baton Rouge, Louisiana, June 6, 2008.

STEPHEN C. RIEDLINGER
UNITED STATES MAGISTRATE JUDGE

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

OVERLAND SOLUTIONS, INC.
                                                    CIVIL ACTION
VERSUS
                                                    NUMBER 06-53-JVP-SCR
DAVID CHRISTENSEN, ET AL

**MAGISTRATE JUDGE'S REPORT**

Plaintiff, Overland Solutions, Inc. filed a motion for a default judgment against defendant Premium Audit Partners, Inc. ("PAP"), and after a report and recommendation was issued on the motion, the district court approved and adopted it, and granted the motion for default judgment against PAP.  The matter was referred to the magistrate judge to determine the amount of the judgment that should be entered against PAP under Rule 55(b)(2), Fed.R.Civ.P.  A hearing was conducted for the presentation of evidence on the issue of damages.[1]

At the time of the hearing and as of this date, PAP remains unrepresented by counsel.  Since counsel for PAP withdrew, notices of all rulings, hearings and activity in the case have been sent to the last known address of PAP.  At the evidentiary hearing, no counsel or corporate representative appeared on behalf of PAP. David Christensen, who is also a defendant in this case, appeared on his own behalf and participated in the hearing without objection

---

[1] Record document numbers 78, 79 and 81.

from the plaintiff.[2]  The following recommendation on the amount of damages that should be awarded to Overland against PAP is based on the exhibits and testimony admitted in evidence at the hearing.

In an amended complaint filed on February 9, 2006, PAP was added as a defendant and Overland alleged that as the alter ego of Christensen, PAP was liable for breach of the employment contract signed by Christensen.  Overland also alleged that PAP was enriched without cause at the plaintiff's expense, and violated the Louisiana Uniform Trade Secrets Act and the Louisiana Unfair Trade Practices Act.[3]  The ruling that granted the motion for default judgment against PAP established the liability of PAP based on the claims alleged by Overland.  Determining the amount of any damages owed by PAP must be based on the law applicable to these claims.

---

[2] Partial summary judgment has been granted in favor of Overland on its breach of contract claim against Christensen. However, the issue of damages was reserved for trial.  Record document number 52. Christensen requested a jury trial in his answer filed on February 14, 2006, and the trial on damages against Christensen has not yet been held.
    Overland stated in its post-hearing memorandum that it is willing to waive its right to jury trial as to damages against Christensen and would accept the court's damages calculation as being applicable to both defendants.  However, this matter has been referred only to determine the amount of the judgment against PAP. Moreover, Christensen has not waived his right to jury trial. Therefore, the court cannot take the course suggested by the Overland.

[3] Louisiana Civil Code Article 2298; LSA-R.S. 51:1431-51:1439; LSA-R.S. 51:1401-51:1409.

**Applicable Law**

Under Louisiana Law, an obligor is liable for the damages caused by his failure to perform a contract. The damages recoverable for breach of contract are measured by the loss sustained and the profit of which the obligee has been deprived. Louisiana Civil Code Articles 1994 and 1995. Under the Louisiana Uniform Trade Secrets Act (LUTSA), in addition to or in lieu of injunctive relief, a complainant may recover damages for the actual loss caused by misappropriation. A complainant also may recover for the unjust enrichment caused by misappropriation that is not taken into account in computing damages for actual loss. LSA-R.S. 51:1433. If willful and malicious misappropriation exists, the court may award reasonable attorney's fees to the prevailing party. LSA-R.S. 51:1434.

The Louisiana Unfair Trade Practices Act (LUTPA) makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." LSA-R.S. 51:1405. Any person who suffers any ascertainable loss of money or movable property, corporeal or incorporeal, as a result of the use or employment by another person of an unfair or deceptive method, act or practice may bring an action to recover actual damages. If damages are awarded for unfair trade practices, the court shall award to the person bringing the action reasonable attorney's fees and costs. LSA-R.S. 51:1409.

## Analysis

Plaintiff sought to recover a total of $903,763[4] in damages and attorney's fees. Plaintiff categorized its damages as follows: (1) $320,400 for the expenses associated with the relief trips of Overland employees who came in from other areas of the country to handle the inventory in the Louisiana office left by the five Overland employees hired by PAP; (2) $240,000 to account for the lost production in the territories of the Overland employees who came to perform the relief work in Louisiana; (3) $81,000 for lost profit opportunity due to PAP's solicitation of Overland's existing customers in 2006 during the ten month period January through October; (4) a total of $123,875 in recruiting and training costs incurred by Overland to replace its five employees hired by PAP; (5) $28,800 in costs for the travel and time spent by executive staff to reassure Louisiana customers and provide interim management and supervision of the Louisiana office; (6) $52,366 for legal fees; (7) $57,322 in damages for loss of goodwill.

Overland exhibit 1 presented a three page summary of its damages estimate, which included a table of the jobs and revenue

---

[4] This amount was the total provided in Exhibit 1 which was admitted into evidence at the hearing. Overland attached a different version of the exhibit to its memorandum, which had a total of $942,763. The amount stated in the exhibit admitted and filed in the record at the time of the hearing is used for this report.

4

produced in 2005 by the five employees who left to work for PAP.[5] Overland exhibit 2 is a copy of its 13-week field auditor training plan for 2005.

In support of the summary of its damage estimate, Overland offered the testimony of David Harris, Overland's senior vice president for the central region, which includes the Louisiana branch office. David Greene also testified for Overland. He is the company's senior vice president of financial operations, which includes accounting, payroll, budgets and forecasting.

**Actual Losses/Damages**

To evaluate the actual loss or damage to Overland resulting from PAP's conduct, the starting point must be the departure of the five Overland field auditors hired by PAP.[6] These employee left Overland at the end of 2005 and the beginning of 2006.[7] Harris

---

[5] The five employees were field auditors Barry Clark, Bennetta Ballew, Charlotte Brown, Dimet Conrad and Misty Townsend. Townsend was full time and the other four individuals were part time. They left Overland at the beginning and middle of January 2006. Although four were part time, Overland's table of 2005 production of the field representatives shows that all of these individuals were key producers of audits in the Louisiana branch office.

[6] Overland's Louisiana branch had approximately 25 field representatives. Christensen was the general manager of the Louisiana office when he resigned effective December 2, 2005.

[7] Harris was not sure of the departure dates of the five employees. According to Harris, two or three of the five who left to work for PAP have returned to work for Overland. He did not state when these employees left PAP and came back to Overland. However, he stated that none of them came back to work during the
(continued...)

testified that all five of the employees were replaced, but he could not provide the names of the replacement employees and their date of hire, or their level of training and experience. No explanation was offered as to why the replacements could not be identified, and the testimony regarding when the five employees were replaced was inconsistent at best. Harris recalled that all of the replacements were not hired at the same time, and that six or seven new auditors were hired in the first quarter of 2006. Therefore, based on this testimony, it appears that by March 31, 2006, auditors were employed to replace the five individuals who left.

Overland sought a total of $123,875 in recruiting and training costs associated with the replacement of the five auditors hired by PAP from Overland. However, this amount of loss/damages is largely unsupported. Greene stated that the $7,500 total for human resources and technology costs related to hiring replacements was difficult to quantify.[8] He stated that he talked to people in these departments and conceded that he arbitrarily picked the underlying per person figures to come up with the total. Therefore, the basis for these costs is too speculative to assess them against PAP.

---

[7](...continued)
crisis period.

[8] Plaintiff exhibit 1, section 4, items A and B.

There is also no sufficient basis to award $13,120 for the two weeks of compensation costs for a home officer trainer.[9] The evidence presented by Overland showed that home office training for 20 to 30 new auditors was held every month in 2006. This training would have been held regardless of the need to replace and train the five people from the Louisiana office who were hired by PAP.

Finally, the largest portion of the recruiting and training costs sought by Overland - $103,155 - was comprised of the salary/benefits/expenses of the replacement auditors during a 13 week training period, and the salary/lost production of the mentors who worked with the replacements during the training period.[10] These figures assume that all five new hires were inexperienced and had to go through a full 13 weeks of training and mentoring before being able to work on their own.[11] However, these training/mentoring costs should not be reimbursed in their entirety because the evidence presented on this point is also inconsistent.

Overland's witnesses could not identify any of the individuals hired in 2006 to replace the five who left the Louisiana office. Nor could they specify the level of experience or training of the

---

[9] *Id.*, item C.

[10] *Id.*, items D and E.

[11] According to Harris, at the end of the 13 week training period field auditors would be released to work on their own. He stated that it takes about one year for an auditor to get comfortable with the work.

new hires. Harris stated that in the initial hiring period none were experienced, but he conceded that some experienced people were hired in 2006. He acknowledged that it was possible that Overland hired replacements with experience who did not have to go through 13 weeks of training. This evidence is insufficient to support the conclusion that all of the replacements for Conrad, Townsend, Brown, Ballew and Clark had to go through a full 13 weeks of training and mentoring. Based on the testimony, the most reasonable conclusion is that a mix of experienced and inexperienced people were hired as replacement field auditors. Therefore, one-half the amount sought - $51,578 - is reasonable to compensate Overland for the costs necessary to train and mentor the replacement employees.

The largest amount of damages sought by Overland were expenses and losses associated with the departure of the five auditors from the Louisiana office. Overland presented evidence that their departure required relief trips to Louisiana by Overland auditors who came from all over the United States. Harris and Greene estimated 120 relief trips were necessary, and this number was based on the number of cases and revenue produced by these auditors in 2005. The total of the expenses for one relief trip times 120 totaled $320,400.[12] This amount is reasonable given the evidence which showed that the five auditors all left in the first part of

---

[12] Plaintiff exhibit 1, section 1.

2006, which is a critical time in the Louisiana office.[13] It took several months to hire replacements, and additional time after hiring for the new employees to get any needed training and orientation to their territory and clients.

Overland also claimed that when an auditor left his territory and came to Louisiana to do relief work there was a loss of production in the territory he left. Overland sought to recover $240,000 in damages for this alleged lost production of the field auditors who performed relief work in Louisiana.[14] Overland, however, failed to present enough information to support these damages. Auditors came from all over the country, and the estimate provided by Overland is merely based on averages and projections, without sufficient specific information about the relief workers' native territories. In these circumstances, an award of damages for this type of lost production would be too speculative.

Overland sought $28,800 in "damage control" costs.[15] This amount represented eight weeks of travel at $1,200 a week for three executives traveling to Louisiana to reassure Overland's customers and provide interim management of the Louisiana office. Harris stated that he was in Louisiana about 16 times in 2006, and that sometimes he split his time to handle other company matters

---

[13] This time was referred to as a "bubble."

[14] Plaintiff exhibit 1, section 2.

[15] Plaintiff exhibit 1, section 5.

unrelated to the situation created by PAP. He testified that another executive and Overland's CEO traveled here just to meet with customers to help stabilize the Louisiana client base. Other than a reduction to Harris's portion of the expenses, this amount of damages is reasonable. Reducing his part by one-half leaves a total of $24,000 for "damage control" expenses.

In Section 3 of its summary of Louisiana damages estimate, Overland sought $81,000 for a category of damages entitled "Lost profit opportunity due to Premium Audit solicitations of existing customer base."[16] Overland stated that the numbers represent the "revenue and associated contribution taken by Premium Audit" from January through October 13, 2006, and that the amounts listed are based on a letter from Christensen dated October 13, 2006 wherein he gave monthly revenue estimates for this period of time. The meaning of this category of damages is unclear, but it is apparently based on the assumption that during this ten-month period in 2006, all of the revenue and profit earned by PAP would have been earned by Overland.[17]

---

[16] The exhibit attached to Overland's memorandum listed the figure of $120,000 for this item of damages. However, the exhibit filed into the record at the hearing stated a figure of $81,000 for lost profit opportunity. The amount listed in the exhibit admitted in evidence at the hearing is used for this report.

[17] Overland offered a different explanation for these damages in its memorandum, stating that PAP was "receiving a benefit from the ability to use OSI's experienced auditors and charge for their services." Record document number 84, p. 6.

Overland did not offer any evidentiary basis to support this assumption. Moreover, in his testimony Greene acknowledged that a unspecified portion of PAP's revenue could have been derived from customers who did not previously have a working relationship with Overland. He also stated that there are other companies doing premium audits in the Louisiana market, and that Overland may have lost revenue to companies other than PAP. Overland's basis for these damages is simply too vague and speculative to support an award.[18]

Overland also sought damages amount of $57,322 for loss of goodwill.[19] Goodwill is synonymous with business reputation. It is the value of a business beyond the value of its physical property and assets. To obtain damages for loss of goodwill, a business must prove that it had a good reputation and show how the business reputation was detrimentally affected by the defendant's actions. Damages awarded for loss of goodwill generally address future revenue and profits.[20]

---

[18] *See, Chemical Distributors, Inc. v. Exxon Corp.*, 1 F.3d 1478, 1486 (5th Cir. 1993)(state law does not allow awards for lost profits that are merely speculative in nature; lost profits must be proven with reasonable certainty).

[19] Plaintiff exhibit 1, section 7.

[20] *See, Simpson v. Restructure Petroleum Marketing Services*, 830 So.2d 480, 486 (La.App. 2 Cir. 2002); *Brennan's Inc. v. Dickie Brennan & Co., Inc.*, 376 F.3d 356, 372 (5th Cir. 2004); *Walle Corp. v. Rockwell Graphics Systems, Inc.*, 1992 WL 245963 (E.D. Sept. 21, 1992)(loss of goodwill evidenced by customers taking their business
(continued...)

Other than a few lines on Exhibit 1 explaining the mathematical calculation, Overland offered no evidentiary basis for an award of damages for loss of goodwill.[21] In fact, the more reasonable conclusion based on Harris' and Greene's testimony is that Overland did not suffer a loss of goodwill. When Harris testified regarding "damage control," he stated that he, Overland's CEO and another executive came to Louisiana for at least eight weeks in order to reassure its customers and stabilize the Louisiana client base. Harris did not state or suggest that their efforts at "damage control" were ineffective. Although evidence was presented that Overland's revenue decreased for 2005-2006, Greene testified that Overland had ample inventory in Louisiana and he did not forecast a "negative" position for 2007.

Overland's request for damages for loss of goodwill is wholly unsupported and should be denied.

**Legal Fees**

Overland requested a total of $52,366 in fees paid to its

---

[20](...continued) elsewhere; damage awards for both future lost profits and business goodwill are duplicative).

[21] Harris stated that this item of damages would be covered in Greene's testimony. However, Greene was not questioned and did not testify about any basis for Overland's recovery of damages for loss of goodwill.

attorneys as of July 7, 2007.[22]  This amount did not include any attorney's fees for the court hearing.

As a prevailing plaintiff, Overland can recover reasonable attorney's fees under the LUTPA, and for willful and malicious appropriation of trade secrets under the LUTSA.  However, Overland's blanket request for over $52,000 in attorney's fees is not supported by any affidavits or invoices.  No information was provided about the number of attorneys who worked on the case, their hourly rates, or the tasks that they performed.  Under the Louisiana statutes the court can only award a "reasonable" fee.[23]  There is no way to evaluate the reasonableness of the fees sought by Overland without knowing the attorneys' hourly rates and the time billed for the work they performed on this case.

Nevertheless, because the entire case has not yet been resolved, Overland's request for an award of legal fees against PAP should be denied without prejudice.  Doing so preserves Overland's right to file a motion for attorney's fees at the conclusion of the entire case.[24]

---

[22] Plaintiff exhibit 1, section 6.

[23] *See*, *Roustabouts, Inc. v. Hamer*, 447 So.2d 543, 550 (La. App. 1 Cir. 1984); *Fourchon Docks, Inc. v. Milchem Inc.*, 849 F.2d 1561 (5th Cir. 1988); Omintech *Intern., Inc. v. Clorox Co.*, 1992 WL 211490 (E.D. La. Aug. 19, 1992), *aff'd in part, rev'd in part*, 11 F.3d 1316 (5th Cir.); *cert. denied*, 513 U.S. 815, 115 S.Ct. 71 (1994).

[24] Rule 54(d)(2), Fed.R.Civ.P.; LR 54.2.

The damages for which Overland seeks compensation which are adequately supported by the exhibits and testimony offered at the evidentiary hearing total $395,978.00.

### **Recommendation**

It is the recommendation of the magistrate judge that plaintiff Overland Solutions, Inc., be awarded damages in the amount of $395,978.00 on its claims against defendant Premium Audit Partners, Inc.

It is further recommended that Overland's request for an award of attorneys' fees be denied without prejudice.

Baton Rouge, Louisiana, June 6, 2008.

_____
STEPHEN C. RIEDLINGER
UNITED STATES MAGISTRATE JUDGE